## AFFIANT IN SUPPORT OF A SEARCH WARRANT

1.    I, Adam Watson, a Special Agent with the United States Postal Service, Office of

Inspector General, being duly sworn upon my oath, states as follows:

## AFFIANT EXPERIENCE AND EMPLOYMENT

2.    I have been a Special Agent with the United States Postal Service, Office of

Inspector General ("USPS-OIG") since May, 2005.  Prior to my employment with the

USPS-OIG, I was employed as a U.S. Postal Inspector from July 2003 thru May 2005.

As a Special Agent with USPS-OIG, I am charged with investigating violations of the

laws of the United States, collecting evidence in cases in which the United States is or

may be a party in interest, and investigating crimes involving funding from the United

States Postal Service.  During my tenure as a Special Agent, I have been trained in the

execution of search warrants for documents and other evidence in cases involving

violations of federal law, including but not limited to: Title 18, United States Code,

Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud),

1956 (Money Laundering), and 1957 (Money Laundering), and Title 42, United States

Code, Section 1320a-7b(b) (Receipt or Payment of Kickbacks). I am currently assigned

to the Houston Office, Southern Area Field Office of the USPS-OIG and I am being

assisted in the investigation by the Department of Labor, Office of Inspector General

("DOL-OIG"), Internal Revenue Service, Criminal Investigations ("IRS-CI"),

Department of Veterans Affairs Office of Inspector General ("VA-OIG"), Department of

1

Health and Human Services, Office of Inspector General ("HHS-OIG"), Drug

Enforcement Administration ("DEA") and the Federal Bureau of Investigation ("FBI").

## PLACE TO BE SEARCHED

3.    This affidavit is made in support of a search warrant for the following location,

more specifically described in Attachment A: Ability Pharmacy, Inc. ("Ability

Pharmacy"), located at 550 Hemphill Street, Fort Worth, Texas 76104 (hereinafter

referred to as **TARGET LOCATION**).

## PURPOSE OF SEARCH WARRANT

4.    Based on my investigations into Ability Pharmacy, Park Row Pharmacy, LLC

('Park Row Pharmacy"), Industrial & Family Pharmacy, Inc. (Industrial & Family

Pharmacy"),  and Bandoola Pharmaceutical, LLC, (Bandoola Pharmaceutical"), it is my

belief that the owners and employees of these pharmacies are engaged in violations of

federal criminal law, including violations of Title 18, United States Code, Sections 1347

(Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud), 1956 (Money

Laundering), and 1957 (Money Laundering), and Title 42, United States Code, Section

1320a-7b(b) (Receipt or Payment of Kickbacks).

5.    Ability Pharmacy, Ability Pharmacy, Park Row Pharmacy, Industrial & Family

Pharmacy, and Bandoola Pharmaceutical are owned by James Noryian, also known as

Jamshid Noryian, and operated in part by Dehshid Nourian, also known as Deshid

Nourian, Christopher Rydberg, Sherri Mofid, and Leyla Nourian.

2

6.    As set forth herein, there is probable cause to believe that located at the **TARGET LOCATION** there exists evidence of crime, fruits of crime, contraband, and other illegally possessed items in violation of Title 18, United States Code, Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud), 1956 (Money Laundering), and 1957 (Money Laundering), and Title 42, United States Code, Section 1320a-7b(b) (Receipt or Payment of Kickbacks), as described in Attachment B.

1)    Based on my experience, training, and participation in investigations of schemes to defraud involving illegal health care businesses, including experience gained in executing search warrants for records and other evidence, I know that the records and items described in Attachment B are the type of records stored at the **TARGET LOCATION.**

2)    Based upon my training, experience, knowledge and participation in this and other criminal investigations, and accumulated knowledge from consultations with other law enforcement agents, including debriefings and interviews of fraud offenders in this and other cases, I know and contend that the following traits are common practices of fraud offenders:

      a.  fraud is frequently a continuing activity over many months and even years;

      b.  fraud offenders keep records of their illegal activities for a lengthy period of time, even extending substantially beyond the time during which they actually produce, market, sell, and profit from their crimes;

    c.  fraud offenders commonly maintain hard copy and computer files, books, records, receipts, notes, ledgers, journals, diaries, address books, and other sundry materials and papers relating to their crimes; and

    d.  such offenders often possess evidence, fruits, and instrumentalities relating to such offenses in their places of business.

7.    The statements in the affidavit are based upon information I learned during the investigation, information provided to me by other agents, public sources, business records, and my experience and background as a Special Agent.

8.    Since this affidavit is being submitted for the limited purposes of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation.

## BACKGROUND ON HEALTH CARE PROGRAMS AND COMPOUND DRUGS

9.    The Federal Employee Compensation Act ("FECA") is a federally funded health care program as described in 20 CFR 10.0 that provides monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States Government, including Postal Service employees, for disability due to personal injury or disease sustained while in the performance of duty.

10.    The FECA program is administered by the Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP") located in 12 district offices throughout the United States.  It is financed by the Employees' Compensation Fund, which consists of funds appropriated by Congress directly or indirectly through a charge

4

back system and administrative fees to various federal agencies, including the U.S. Postal Service. FECA is a federally funded health care program as defined in 42 U.S.C § 1320a-7b.

11.    Claims examiners at DOL-OWCP manage workers compensation claims. District Office 16 in Dallas, Texas handles all claimants residing in or surrounding the Dallas, Houston, Austin, and San Antonio areas.

12.    Employees are entitled to receive all medical services, appliances or supplies, which a qualified physician prescribes or recommends and which the DOL-OWCP considers necessary to treat the work-related injury. Benefits are only available while the effects of a work-related condition continue. FECA provides coverage for pharmaceuticals necessary to treat symptoms which are the result of a work-related injury when prescribed by a doctor and medically necessary.

13.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") is a federally funded program in which the Department of Veterans Affairs shares the cost of certain health care services and supplies with eligible beneficiaries. To be eligible for CHAMPVA, the beneficiary cannot be eligible for TRICARE. CHAMPVA provides coverage to the spouse or widow(er) and to the children of a Veteran who is rated permanently and totally disabled due to a service-connected disability, was rated permanently and totally disabled due to a service-connected condition at the time of death, died of a service-connected disability, or died on active duty and the dependents are not otherwise eligible for Department of Defense TRICARE benefits.

14.     In general, the CHAMPVA program covers most health care services and supplies

that are medically and psychologically necessary. This includes reimbursement of costs

for medication. CHAMPVA is always the secondary payer to Medicare and would

reimburse beneficiaries for costs not covered by Medicare provided insurance.

15.     Compound drugs, which require a prescription from a doctor, are prepared by a

pharmacist who mixes or adjusts drug ingredients to customize a medication to meet a

patient's individual needs.  In many cases, the compound drugs are in a cream form which

the patient can apply topically to the affected areas.  Compound drugs are typically

prescribed as a multi-biotic (multi-vitamin) or to treat pain or scarring.  The costs of such

drugs are dependent on the ingredients mixed into the compound.

16.     The following table demonstrates the approximate amounts paid to each of the

pharmacies referenced above by DOL-OWCP for Postal Service claims between 2012

and 2016:

| Date Rage | Pharmacy | Amount Paid | Claims |
|---|---|---|---|
| May 15, 2014 - Oct. 1, 2015 | Ability Pharmacy | $34,445,153.00 | 347 |
| Aug. 20, 2015 - Feb.  26, 2016 | Industrial & Family Pharmacy | $15,758,309.00 | 257 |
| May 1, 2015 - Feb. 26, 2016 | Park Row Pharmacy | $3,402,407.00 | 62 |

17.     The following table demonstrates the approximate amounts paid to each of the

pharmacies referenced above by DOL-OWCP for VA related claims between 2014 and

2016 :

6

| Date Rage | Pharmacy | Amount Paid | Claims |
|---|---|---|---|
| May 1, 2014 – Sept. 18, 2015 | Ability Pharmacy | $ 5,707,109.00 | 73 |
| Sept 25, 2015 – Feb. 18, 2016 | Industrial & Family Pharmacy | $ 2,800,228.00 | 62 |
| April 23, 2015 – Feb. 11, 2016 | Park Row Pharmacy | $ 202,851.00 | 2 |

18.    Between July 30, 2014 and March 9, 2015, approximately $ 538,559.00 was paid

to Ability Pharmacy by CHAMPVA for 122 beneficiary claims.

## FACTS SETTING FORTH PROBABLE CAUSE

19.    Based on information obtained through this investigation, I submit that there is

probable cause to establish that the owners and employees of Ability Pharmacy, Park

Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical have

caused the submission of false claims to DOL-OWCP in violation of Title 18, United

States Code, Sections 1347 and 1349.  I submit that there is also probable cause that the

owners and employees of Ability Pharmacy, Park Row Pharmacy, Industrial & Family

Pharmacy, and Bandoola Pharmaceutical have been engaged in a kickback scheme with

doctors to pay monetary funds in exchange for writing prescriptions for compound

pharmaceuticals which were submitted to a federal health care benefit program in

violation of Title 42, United States Code, Section 1320a-7b(b).

20.    This conspiracy resulted in health care fraud by doctors not treating patients they

prescribed medications to and by prescribing excessive refills in order to maximize

billing for medically unnecessary medications.  In addition, there is probable cause to

7

believe funds derived from this illegal kickback scheme resulted in illegitimate funds being paid by a federal health care program to the aforementioned pharmacies, resulting in the ill-gotten proceeds.  These ill-gotten proceeds were then moved through several different bank accounts and shell companies in an attempt to conceal the source of the funds in violation of Title 18, United States Code Sections 1956 and 1957.

21.     Ability Pharmacy is a compound pharmacy located at 558 Hemphill Street, Fort Worth, Texas, 76104 and 550 Hemphill Street, Fort Worth, Texas 76104.  According to Texas Secretary of State records, Dehshid Nourian is the President of Ability Pharmacy. Bank records indicate Dehshid Nourian and Christopher Rydberg as authorized signers for bank accounts held in the name of Ability Pharmacy.  Ability Pharmacy is enrolled in the DOL-OWCP Program.

22.     Park Row Pharmacy is a compound pharmacy located at 701 W Park Row Drive, Suite 707, Arlington, Texas, 76013.  According to Texas Secretary of State records, Christopher Rydberg is an authorizing agent and Dehshid Nourian is a Manager. According to the Texas State Board of Pharmacy, Dehshid Nourian is the Pharmacist-in-Charge.  Park Row Pharmacy is enrolled in the DOL-OWCP Program.

23.     Industrial & Family Pharmacy is a compound pharmacy located at 2301 NE 28th Street, Fort Worth, Texas, 76106.  According to Texas Secretary of State records, Dehshid Nourian is a Director. According to the Texas State Board of Pharmacy, Dehshid Nourian is listed as an Officer.  Industrial & Family Pharmacy is enrolled in the DOL-OWCP Program.

24.    Bandoola Pharmaceutical, LLC ("Bandoola Pharmaceutical") is a shell company

that utilized the same address of Ability Pharmacy in Fort Worth, Texas through

February 2016 when bank records indicate that the address was changed to 401 College

Ave. Fort Worth, Texas, 76104.  According to Texas Secretary of State records, Sherri

Mofid and Christopher Rydberg are governing persons with Bandoola Pharmaceutical.

Bank records indicate Christopher Rydberg, Sherri Mofid and Leyla Nourian are

authorized signers for bank accounts held in the name of Bandoola Pharmaceutical.

25.    The investigation has revealed that James Noryian is the owner of Ability

Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola

Pharmaceutical. The investigation has identified Noryian as the brother of Dehshid

Nourian, son of Sherri Mofid, and stepfather of Christopher Rydberg.

26.    The Nourian/Noryian family owns and controls multiple holding companies

including Jade and Joy Holdings, LLC (Jade and Joy Holdings) and HJLM Holding LLC

(HJLM Holding).  Bank records indicate Jade and Joy Holdings has a business address of

6210 Campbell Street Suite 150, Dallas, Texas, 75248.  Authorized account signatures

include ███████ (Manager), Christopher Rydberg and Leyla Nourian.  HJLM Holding

owns 401 College Avenue, Fort Worth, Texas, 76104.  Registered Agents of HJLM

Holding include Leyla Nourian.

27.    Dr. Kevin Williams is a licensed physician with a primary practice in orthopedic

surgery, according to the Texas Medical Board.  Texas Secretary of State records

identify Dr. Williams as the Registered Agent and President of Ennis Orthopedics PA,

located at 802 W Lampasas Street, Ennis, Texas, 75119.  Dr. Williams is also the

manager of Magnum Surgical Products LLC. ("Magnum Surgical Products"), located at 241 Cody Road, Ennis, Texas, 75119. According to DOL-OWCP program enrollment documents, Ennis Orthopedics is enrolled in the DOL-OWCP program.

28.    Greentree Health Services, Inc. ("Greentree Health") is a medical provider located at 1 Chisholm Trail Road, Suite 300, Round Rock, Texas, 78681. Garry Craighead is the owner of Greentree Health. Dr. Williams is the medical director for Greentree Health.

29.    Dr. ███████ is a licensed physician with a primary practice in internal medicine and a secondary practice in neuromuscular disease. Secretary of State records indicate Dr. ███ as the President of multiple entities including ████████████████ ██████ Dr. ██████ primary practice address is located at 6210 Campbell Road Dallas, Texas, 75248, according to the Texas Medical Board. Dr. ████ has prescribed compound medications to CHAMPVA recipients.

30.    Dr. Les Benson is a licensed physician with a primary practice in occupational medicine, according to the Texas Medical Board. Dr. Benson's primary practice location is 2114 Birdcreek Drive, Temple, Texas 76502. Dr. Benson has additional office locations at 3320 Hillcrest Drive, Waco, Texas 76708 and 3616 Altamesa Boulevard, Fort Worth, Texas 76133. Dr. Bensons' Altamesa office location is owned by "Queen Shiva". According to Texas Secretary of State records, Leyla Nourian is an authorized agent of "Queen Shiva." According to DOL-OWCP program enrollment documents, Dr. Benson is enrolled in the DOL-OWCP program.

31.    Dr. Michael Taba is a licensed physician with a primary practice in orthopedic surgery, according to the Texas Medical Board. Dr. Taba's practice is located at 1705

Ohio Drive Suite 200, Plano, Texas 75093. According to DOL-OWCP program

enrollment documents Dr. Taba is enrolled in the DOL-OWCP program. Dr. Taba resides

at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, according to Collin County, Texas

Central Appraisal District website.

## The Conspiracy to Pay Kickbacks and Commit Health Care Fraud

32.     The investigation has revealed that the owners and employees of Ability

Pharmacy, Park Row Pharmacy, Industrial and Family Pharmacy and Bandoola

Pharmaceutical have paid marketers and doctors to refer DOL-OWCP and CHAMPVA

beneficiaries to these pharmacies for the fulfillment of compound drug prescriptions.

### A. Marketers

33.     On January 28, 2016, Special Agents interviewed Robbie Jossa, a former marketer

for Ability Pharmacy.  Jossa identified James Noryian as the owner of Ability Pharmacy

and Park Row Pharmacy.  He explained that Noryian created business names based on

his interests such as Bandoola, a character from a book.  Jossa advised agents that

Noryian was also an avid gambler and referenced business names Noryian created such

as "Queen Shiva" and "Ace Queen."  Jossa identified Christopher Rydberg as Noryian's

stepson.

34.     Jossa was introduced to Noryian by Dr. ▮▮▮▮▮, a previous colleague of Jossa's.

Jossa advised agents Dr. ▮▮▮ and Noryian were friends and knew each other from an

early age.  Jossa informed agents Dr. ▮▮▮ provided a "shitload" of prescriptions to

Ability Pharmacy without seeing the patients.  Jossa was aware of Ability Pharmacy

11

receiving between $15,000 and $30,000 in payment per prescription from DOL-OWCP
and that each tube of medicine cost approximately $15.00 to make.

35.    Jossa advised agents he was aware Dr. ▆▆ had a clinic in Dallas called ▆▆
▆▆▆▆ and that the building it occupied was owned by Noryian. ▆▆▆▆
is located at 6210 Campbell Road, Dallas, Texas 75248. Dallas County, Texas Central
Appraisal District identifies Jade & Joy Holdings as the owner of this property.

36.    Jossa identified Dr. Benson and Dr. Taba as receiving kickbacks for referring
prescriptions to Ability Pharmacy. Jossa started hearing the name of "Dr. Kevin
Williams" at Ability Pharmacy just prior to when he stopped marketing for them, around
July or August 2015.

37.    On February 22, 2016, Special Agents interviewed Thomas McJunkins, a former
marketer for Ability Pharmacy. McJunkins told agents that he met Jamshid "James"
Noryian, owner of Ability Pharmacy in 2014. Noryian told McJunkins that the
reimbursement rate for compound pain creams was "through the roof." McJunkins stated
that around October 2014, Noryian started pushing McJunkins to solicit DOL doctors and
bring them to the pharmacy. McJunkins identified Noryian as the brother of Dehshid
Nourian, who is the Pharmacist at Park Row Pharmacy. McJunkins also stated that Dr.
Benson was one of the DOL doctors that worked closely with Noryian.

38.    McJunkins was close with Robert Ritter, a pharmacist for Ability Pharmacy.
McJunkins told agents that he heard that some employees of Ability pharmacy had
moved from the 558 Hemphill location and the building was empty but he knew that
Ritter was still working out of that location. According to postal records, a change of

address was filed for numerous companies and individuals associated with Noryian,

including Robert Ritter, on February 19, 2016 but no change of address was filed for

Ability Pharmacy.

### B. Doctors

39.     Between May 1, 2014 and January 14, 2016, Dr. Williams, Dr. Benson and Dr.

Taba referred a total of approximately 766 postal service claimant cases to Ability

Pharmacy, Park Row Pharmacy and Industrial & Family Pharmacy for prescriptions.

### i.    Dr. Kevin Williams

40.     During the course of this investigation Special Agents with the OIG interviewed

Garry Craighead, Doctor of Chiropractic, who told agents that as the medical director for

Greentree Health, Dr. Williams' duties are to "triage" patients and handle their

medications. Dr. Williams is paid in exchange for signing prescriptions which Dr.

Craighead directs to specific pharmacies in Houston, Texas. These pharmacies then

submit claims for reimbursement to FECA.

41.     Dr. Craighead agreed to pay Dr. Williams $1,000,000.00 a month for his work as a

"medical director" at Greentree Health. Dr. Craighead told agents this exorbitant salary

was simply a built in "kick-back" so that Dr. Williams would sign the prescriptions for

compound creams and patches. Dr. Craighead told agents that, in some instances, Dr.

Williams never actually saw or treated the patients for whom he signed prescriptions.

Dr. Williams told Dr. Craighead that he was also working with other pharmacies that paid

him 35% for a scheme similar to the arrangement with Dr. Craighead.

42.     Dr. Craighead told agents that he and his staff routinely interacted with Dr. Williams via text message and email.

43.     On March 24, 2016, agents executed a federal search warrant for Dr. Williams's cell phone.  Contained on the phone were e-mails and text messages between Dr. Williams, and employees of Ability Pharmacy, Park Row Pharmacy and Industrial & Family Pharmacy which discuss the demographics of referred patients as demonstrated below:

i.      September 28, 2015, at 3:41 p.m. from Megan Marines (identified also as "Megan Ability Pharm) at megan@mailrx.com to Dr. Williams: "Hello I need claim numbers for… ███████████████████ and need Georgia address for ████████ her demo shows Tennessee address. Thanks."

ii.     March 11, 2016, at 10:12 a.m. from "Prescriptions park row" to Dr. Williams with the subject "Park Row New Patients." "Yesterday evening we received some prescriptions for new patients, but did not receive the demographics. If you could please send over the demographics for the following patients it would be greatly appreciated. –███████████ –████████ –██████████ –█████ ██████ –████████ –██████████ –████████ –████████ Thank you, Courtney McCoy".

iii.    March 11, 2016, at 12:49 p.m. from Megan Marines at megan@ifpharmacy.com to Dr. Williams: "Good afternoon Dr. Williams I have attached a list of names below for scripts that were faxed in 03/10/2016 that did not include the patients information.  Please fax in patient information at your earliest convenience.



– last name possibly misspelled– ▮▮▮▮▮▮ – ▮▮▮▮▮▮ We are
also needing an updated phone number for: ▮▮▮▮▮. Thank you, Megan,
Industrial & Family Pharmacy, Phone: 817-625-6265, Fax: 817-625-6272." At
1:22 p.m., megan@ifpharmacy.com sent another e-mail to Dr. Williams: "also
need phone # on ▮▮▮▮▮▮▮▮. Thank you."

iv.    March 11, 2016, at 2:06 p.m. from "Prescriptions park row" at
scripts@parkrowpharm.com to Dr. Williams with the subject "Park Row Refill
Request." "Good afternoon Dr. Williams, Sorry to bother you again, but we are
missing a new script from patients ▮▮▮▮▮ and ▮▮▮▮▮▮ I also need
an updated demo for patient ▮▮▮▮▮ and demographics for new patient
▮▮▮▮▮▮. Thank you, Courtney McCoy." Dr. Williams responded at 2:13
p.m.: "Ok. Sending everything except demo on ▮▮▮▮▮ Im waiting on that
from the clinic. As soon as I get it will fax. KW."

v.    March 11, 2016, at 2:49 pm. from Prescriptions park row at
scripts@parkrowpharm.com to Dr. Williams with the subject "Re: Park Row
Refill Request." "Dr. Williams, Do you by chance have an alternate address for
▮▮▮▮▮▮? We can't ship to PO Boxes. Also, what is the street address for
▮▮▮▮▮▮? I can't make it out on the face sheet. Courtney McCoy." Dr.
Williams responded at 2:56 p.m.: "The po box is all I have for ▮▮▮▮▮. I will
get a street address. ▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮"

vi.    March 17, 2016, at 10:00 a.m. from Prescriptions park row with the subject
"Patient: ███████" to Dr. Williams: "Good Morning Dr. Williams, We still
don't have Demographics for ███████ Can you please forward again.
Thanks Park Row Pharmacy."

vii.    March 21, 2016, at 4:48 p.m. from Park Row Pharmacy to Dr. Williams: "This is
Park Row Pharmacy, we have a patient that wants a refill but is currently out of
refills, we have faxed your office twice and we only received okay on one Rx.
We are still waiting for patient ███████. Please have your office fax back
Refill request for ███████. Thanks, Park Row Pharmacy P:817.459.1212
F:817.459.1214"

44. Text messages were captured from Dr. Williams's phone between Dr. Williams and a
contact saved as "Chris James Son." Between March 9, 2016 and March 11, 2016 these
texts messages discussed a meeting to take place at a Starbucks coffee shop on March 10,
2016. On March 11, 2016 text messages between Dr. Williams and "Chris James Son"
discuss a meeting to take place at 802 West Lampasas, Ennis 75119.

45. In an interview with ███████ an injured federal employee, ███████ recalled
that he was seen by Dr. Williams on two occasions around April 2015 (DOL-OWCP
billing data shows ███████ first visit with Dr. Williams was on March 18, 2015). ███████
then received medications prescribed by Williams from Ability Pharmacy that he had not
expected nor ever was informed would be coming. The box from Ability Pharmacy
contained several compound creams and capsules. ███████ FECA claim was billed by

16

Ability Pharmacy starting January 15, 2015 through September 18, 2015. Beginning October 15, 2015, Garcia's FECA claim was billed by Industrial & Family Pharmacy.

46.    A review of bank records for Magnum Surgical Products (owned by Dr. Williams) revealed the following payments from Bandoola Pharmaceutical (operated by Christopher Rydberg) to Magnum Surgical Products with accompanying memo notations (checks in the amount of $219,000.00, $125,000.00 and $239,000.00 were signed by Christopher Rydberg and remaining cashier's checks were remitted by Christopher Rydberg):

| Date | Amount | Memo Notation |
|---|---|---|
| October 1, 2014 | $309,000.00 | |
| September 2, 2014 | $219,000.00 | purchase of materials |
| February 16, 2015 | $125,000.00 | mar |
| March 4, 2015 | $214,000.00 | marketing and commission |
| April 9, 2015 | $759,001.35 | marketing |
| May 7, 2015 | $560,000.00 | marketing and purchases |
| June 9, 2015 | $381,000.00 | |
| August 5, 2015 | $239,000.00 | marketing |

47.    A review of HJLM Holding bank records revealed a check dated November 2, 2015 for $800,000.00 to Magnum Surgical Products signed by Christopher Rydberg with the notation "Loan."

48.    Based on previous investigations, it is common in kickback schemes between doctors and pharmacies to attempt to conceal the reason of the payments calling them marketing, loans, consulting fees, speaking fees, or medical studies.

### i.  Dr. ███████

49.    Marketer Robbie Jossa identified Dr. ██████ as a longtime friend of James Noryian.

50.    On April 18, 2016, ██████████ a CHAMPVA beneficiary, was interviewed by agents and reported speaking to an employee from Ability Pharmacy following treatment from her doctor. Following her telephone call to Ability Pharmacy she received a telephone call from Dr. ██████ regarding other prescriptions. ██████ stated that she then began receiving an excessive amount of prescription pain creams and vitamins each month. ██████ reported never being treated by Dr. ██████

51.    Between July 30, 2014 and March 9, 2015, Dr. ██████ wrote 100 prescriptions for two recipients of CHAMPVA which totaled $500,557.78. Of those 100 prescriptions, ██████ was the claimant for seventy-four prescriptions which totaled approximately $439,948.42 between September 25, 2014 and March 9, 2015.

### i.  Dr. Michael Taba

52.    Marketer Robbie Jossa identified Dr. Taba as receiving kickbacks for referring prescriptions to Ability Pharmacy.

53.    A review of HJLM Holding, LLC bank records revealed eight checks signed by Christopher Rydberg totaling $18,950.44 from December 7, 2015 to February 2, 2016 with memo notations indicating payments associated with Dr. Taba.    Two of these

checks indicate payment related to ▮▮▮▮▮▮▮▮▮ (the home of Dr. Taba) while other checks indicate payment for "Taba Job."

54.     A review of bank records for an account in the name of Sherri Mofid and Dehshid Nourian, revealed three checks totaling $285,000.00 from September 8, 2014 to November 17, 2014 with memo notations indicating payments to Michael Taba regarding a "loan."

### i.     Dr. Les Benson

55.     On February 18, 2016, agents executed a federal search warrant at Dr. Benson's business locations. Agents interviewed Latosha Morgan, Dr. Benson's Fort Worth office manager who was responsible for day-to-day operations. Morgan advised agents she was aware James Noryian owned Dr. Benson's Altamesa Drive location.

56.     Morgan stated that around May 2014 James Noryian from Ability Pharmacy visited with her and a fellow staff member. Morgan reported to agents Noryian offered $250.00 for every pain cream prescription written out of Dr. Benson's office. Around that time, Morgan heard Noryian tell Dr. Benson that if Dr. Benson wrote a certain number of prescriptions then Noryian would not charge him rent. Dr. Benson told Morgan that he did not make the agreement with Noryian.

57.     Morgan said she saw pain cream claims between $10,000.00 to $30,000.00 and she thought it had to be a joke. Morgan stated once a prescription was written, Ability Pharmacy put the patients on auto-refill. Morgan stated when she reported the automatic refills to Noryian, he told her it was a computer glitch and agreed to fix the billing with

DOL-OWCP by having the charges reversed. According to Morgan's handwritten notes seized during the search, Morgan indicated on September 23, 2014 she discovered the billings had not been reversed.

58.    Morgan reported that Noryian started sending lists saying patients needed prescriptions and asked to have Dr. Benson sign a blank prescription. Morgan refused and told Noryian "it doesn't work that way."

59.    On February 18, 2016, Dr. Benson's Waco office manager Amber Bass, was interviewed. Bass stated that prescriptions for pain creams were sent to Ability pharmacy. Bass stated that Ability pharmacy recently changed their name to Industrial Pharmacy, but that it was the same pharmacy. Bass was instructed by Dr. Benson to write a prescription for pain creams for every patient.

60.    A review of bank records obtained by agents also revealed that in June 2014, a check in the amount of $9,000.00 was paid by Ace Queen, LLC to Les Benson. The accompanying memo stated "Rent Refund for Wrk by Tenant." According to Texas Secretary of State records, Leyla Nourian is a Director of Ace Queen, LLC.

61.    A review of bank records obtained by agents revealed that in December 2014, a check in the amount of $3,000.00 was paid to Mike Benson by Bandoola Pharmaceutical. The accompanying memo indicated the check was for "consulting." Michael Benson is Les Benson's son.

**Money Laundering**

62.     Over the course of this investigation agents traced funds from Ability Pharmacy, Park Row Pharmacy, and Industrial & Family Pharmacy billings paid by DOL-OWCP into accounts identified by the pharmacies for such payments. Agents then traced the concealment of these funds through several accounts maintained by owners of the aforementioned pharmacies, including shell companies, to their final destination.

63.     Between October 2, 2014 and May 5, 2016 a total of 92 transactions were made which resulted in the movement of monetary funds between 11 different accounts all owned or linked to Ability Pharmacy, Park Row Pharmacy, Industrial and Family Pharmacy, Bandoola Pharmaceutical, and Jade and Joy Holdings.

64.     Between August 20, 2015 and January 28, 2016, Industrial & Family Pharmacy received payments from DOL-OWCP for the reimbursement of pharmaceutical services via direct deposits into Wells Fargo Bank account xxx0302 totaling $15,935,279.70. Bank records indicate that between October 22, 2015 and December 31, 2015, forty-two (42) withdrawals via cashier's checks were made by Rydberg totaling $13,699,907.00. The cashier's checks were made out to various legitimate businesses in amounts ranging from $47,912.00 to $952,781.00, but the checks were never provided to the payee. Ultimately, these cashier's checks were re-deposited into accounts maintained by Rydberg with each cashier's check indicating "Not used for purposes indicated.".

**Probable Cause to Believe Requested Records are Located at the Target Location**

65.     On May 12, 2016, during the execution of a federal search warrant of Ability Pharmacy at 558 Hemphill Street Fort Worth, TX 76104, agents discovered the interior

space led directly into 550 Hemphill Street. No closed doors separated the locations from the inside. The exterior of the building indicated the interior space shared by 558 Hemphill Street was part of 550 Hemphill Street.

66.     From the hallway of 558 Hemphill Street, agents were able to view file boxes and other documents located within 550 Hemphill Street.

67.     During a protective sweep of the property, agents observed file boxes, paperwork, desks and computer equipment. Agents also observed numerous items identifying "Ability" within the 550 Hemphill space.

68.     Prior to making entry into 558 Hemphill, James Noryian who identified himself to agents as the leasing agent of 558 Hemphill Street, stated the location was vacant. Agents advised Noryian there was a search warrant for 558 Hemphill Street and requested keys to gain access.  Noryian advised agents he had the keys to the facility and provided them to agents to allow access.

69.     Following entry into the space, Noryian was questioned again about the ownership of the space. Noryian stated he was working in partner with Transventon (spelling unknown) who was another real estate firm and both were leasing agents for 558 Hemphill.  Noryian stated 558 and 550 Hemphill was all one unit. Noryian was asked for consent to search 550 Hemphill Street. Noryian stated 550 Hemphill was related to his real estate operation and did not provide consent to search.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

70.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the **TARGET LOCATION**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

71.    I submit that if a computer or storage medium is found at the **TARGET LOCATION**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    i.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

ii. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

iii. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

iv. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

v. Based on actual inspection of other evidence related to this investigation, including but not limited to, financial records and emails, I am aware that computer equipment was used to generate, store, and print documents used in the conspiracy to commit health care fraud, kickback scheme and money

24

laundering scheme.  There is reason to believe that there is a computer system currently located at the **TARGET LOCATION**.

72.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the **TARGET LOCATION** because:

    i.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

ii.   As explained herein, information stored within a computer and other
electronic storage media may provide crucial evidence of the "who, what,
why, when, where, and how" of the criminal conduct under investigation, thus
enabling the United States to establish and prove each element or
alternatively, to exclude the innocent from further suspicion. In my training
and experience, information stored within a computer or storage media (e.g.,
registry information, communications, images and movies, transactional
information, records of session times and durations, internet history, and anti-
virus, spyware, and malware detection programs) can indicate who has used
or controlled the computer or storage media. This "user attribution" evidence
is analogous to the search for "indicia of occupancy" while executing a search
warrant at a residence. The existence or absence of anti-virus, spyware, and
malware detection programs may indicate whether the computer was remotely
accessed, thus inculpating or exculpating the computer owner. Further,
computer and storage media activity can indicate how and when the computer
or storage media was accessed or used. For example, as described herein,
computers typically contain information that log: computer user account
session times and durations, computer activity associated with user accounts,
electronic storage media that connected with the computer, and the IP
addresses through which the computer accessed networks and the internet.
Such information allows investigators to understand the chronological context
of computer or electronic storage media access, use, and events relating to the

26

crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

iii.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

27

iv.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

73.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the

28

loss of the data either from accidental or intentional destruction. This is true because of the following:

i.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

ii.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and

reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

iii.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

74.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

75.    Based on my training and experience and the facts as set forth in this affidavit I submit there is probable cause to believe the owners and employees of Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical have caused the submission of false claims to DOL-OWCP in violation of Title 18, United States Code, Sections 1347 and 1349. I also submit that there is also probable cause that the owners and employees of Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical have been engaged in a kickback scheme with medical providers to be paid monetary funds in exchange for writing

prescriptions for compound pharmaceuticals which were submitted to a federal health care benefit program in violation of Title 42, United States Code, Section 1320a-7b(b). I further submit that these crimes resulted in ill-gotten proceeds that were moved through several different bank accounts and shell companies in an attempt to conceal the source of the funds in violation of Title 18, United States Code Sections 1956 and 1957. I submit that evidence of said violations will be found at the **TARGET LOCATION**.

76.    In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the location described, authorizing a search as described more fully in Attachment A and the seizure of items described in Attachment B.

Adam Watson
Special Agent, (USPS-OIG)

SWORN TO AND SUBSCRIBED before me this ___ day of May 2016.

PAUL D. STICKNEY
United States Magistrate Judge

31

## ATTACHMENT A
### Property to Be Searched

Ability Pharmacy, Inc. - 550 Hemphill Street, Fort Worth, Texas 76104 is

described as a one-story white brick building. The front door to Ability Pharmacy is

located on Hemphill Street with the numbers 550 above a single glass door with security

bars. 550 Hemphill Street is connected inside with 558 Hemphill Street. See photographs

below:



1



## ATTACHMENT B
### Items to be Seized

Any and all of the following named items and information relating to Ability

Pharmacy, Inc., ("Ability Pharmacy") Park Row Pharmacy, LLC ("Park Row

Pharmacy"), Industrial & Family Pharmacy, Inc. ("Industrial & Family Pharmacy"), and

Bandoola Pharmaceutical, LLC ("Bandoola Pharmaceuticals") relating to violations of

Title 18, United States Code, Sections 1347 (Health Care Fraud) and 1349 (Conspiracy to

Commit Health Care Fraud), Title 18, United States Code, Section 371 (Conspiracy to

Defraud the United States and to Pay and Receive Kickbacks) and Title 42, United States

Code Section, 1320a-7b(b) (Paying and Receiving Kickbacks) for the period of January

1, 2012 through the date of execution of the search warrant in this matter.  This

information may be stored or filed and includes any format in which the information may

exist.

1. All documents and affiliated records kept in the regular course of a pharmacy

   business including:

   a. Records for compounded medications for the substances imported, received,

      sold, delivered, exported or otherwise disposed of.

   b. Records related to the purchase or sale of any compounded medication,

      including but not limited to invoices, bills, receipts, bills of lading, and ledgers.

   c. Records or other documents referencing compounded medication creams for

      the treatment of scars, pain, acne, erectile dysfunction, dental pain, or

      compounded multi-vitamin capsules.

3

    d. Paper prescriptions and copies of prescriptions for compounded medications

    e. Inventories for compounded medications

    f. Invoices

2. All documents and affiliated records constituting, concerning, or relating to patient files, medical documentation, notes, bills, invoices, and claims for payment for services billed, provided or alleged to have bene provided to patients to include, but not limited to, claim forms, explanations of medical benefits, prescriptions, certificates of medical necessity, remittance notices, electronic funds transfer documents for payments (including electronic data interchange paperwork for the designated financial institution), "Super Bill" paperwork, patient sign-in sheets, "Soap Notes," information from the treating or prescribing physician concerning the prescriptions and patient's diagnosis, and proof of delivery of services and/or items that were submitted by any representative acting on behalf of Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical for payment by the Federal Employees Compensation Act (FECA), other federal health care benefit programs, or private insurance and any other medical documentation that may be contained in the patient file to support the alleged criminal offenses.

3. All documents and affiliated records constituting, concerning, or relating to compounded medication patient billing records, patient insurance information, including but not limited to, initial or last known patient information sheet(s), copy of patients' insurance identification card, copy of patients' personal identification,

4

all patient and physician correspondence and other documentation detailing the identity of individuals receiving compounded medications alone or in combination with other prescription medications.

4. All letters and other documents constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals that receive health care coverage from FECA, other federal health care benefit programs, or private insurance.

5. All correspondence to and from patients regarding FECA, other federal health care benefit programs, or private insurance.

6. All correspondence to and from FECA, other federal health care benefit programs, or private insurance including but not limited to, manuals, advisories, newsletters, bulletins, publications, and information relating to claim approvals or denials.

7. All correspondence and canceled checks relating to notice of overpayment and request for refunds from FECA, other federal health care benefit programs, or private insurance.

8. All documents and affiliated records constituting, concerning, or relating to providing of prescription drug services by Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical or any representative acting on its behalf including but not limited to payments for referrals or to referral sources including doctors, marketers, or other third parties.

9. All financial books, records, and tax documents constituting, concerning, or relating to payments from Ability Pharmacy, Park Row Pharmacy, Industrial &

Family Pharmacy, and Bandoola Pharmaceuticals to employees and/or clinics, and/or labs, and/or doctors, and/or referral sources, including:

a. Bank Accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, loan statements, loan agreements; and

b. Credit card/ ATM debit card accounts

c. Ledgers

10. All Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical employee and contractor personnel files and resumes, including but not limited to, any hard copy or computer files listing any and all employee or contractor names, addresses, telephone numbers, timecards, personnel schedules, training records, and background information for all current and former employees or contractors.

11. All contracts, agreements or other documents for any outside medical insurance billing company, individual, doctor, company, or governmental entity contracting or otherwise doing business with Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceuticals.

12. All contracts, agreements or other documents between Ability Pharmacy, Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical.

13. Fax transmissions, e-mail communications and other communication forms relating to correspondence and contractual agreements between Ability Pharmacy,

6

Park Row Pharmacy, Industrial & Family Pharmacy, and Bandoola
Pharmaceutical.

14. Any and all financial records, including but not limited to, cash receipts, company
    financial statements, accounts receivable and accounts payable, bank statements,
    credit card bills, ledgers, books, records, correspondence, applications, checks,
    money orders, wiring instructions, facsimile transmissions, e-mails, notes, and
    receipts.

15. Payroll records, W-9 and 1099 forms, and all correspondence, notes, or other
    documents relating to these records and forms.

16. All documents and affiliated records constituting, concerning, or relating to
    evidence of dominion or control over telephone numbers, facsimile numbers and
    other forms of communications, including but not limited to, billing records
    service agreements, customer account information.

17. Address/telephone books, rolodex indices and other documents reflecting the
    names, identities, addresses (both physical and electronic), and telephone numbers
    of individual customers and or agents/representatives of Ability Pharmacy, Park
    Row Pharmacy, Industrial & Family Pharmacy, and Bandoola Pharmaceutical.

18. Passwords, codes, combinations, or keys to allow entry into any locked location
    where records are maintained including but not limited to any safe, strong box,
    lock box, briefcase, onsite storage facility, or filing cabinets.

19. Currency over $1,000.00.

7

20. Any cellular telephones, Smart Phones, BlackBerry (Research in Motion) devices, and Voice over Internet Protocol (VoiP) devices such as Vonage, Skype, VTC and other providers supposed to be utilized for "Telemedicine" purposes.

21. Additionally, all computer equipment and the items listed above that are contained in any computer equipment as follows, and pertains to the above listed persons, businesses, or entities:

   a. Computer hardware, consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots," I-pods, memory facsimile machines and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems, routers, cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.   Computer software, that is, digital information which can be interpreted by a computer and any of its related components to direct the way they work, as well as instruction manuals relating to the same. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

c.   Electronic Storage Media, that is, any object or device upon which computer data can be stored. It includes external and internal hard drives, floppy disks, CDs, DVDs, MP3 devices, "flash" or "thumb" drives, tapes, Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, cellular phones, iPods, Bernoulli drives, electronic notebooks, SIM cards, SD-cards, and digital cameras.

d.   For any computer hard drive or other electronic media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

   i.   evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

   ii.  passwords, encryption keys, and other access devices that may be necessary to access the MEDIA;

iii.   documentation and manuals that may be necessary to access the MEDIA

or to conduct a forensic examination of the MEDIA.

22. As used above, the terms "documents," "records" and "information" include all of

the foregoing items of evidence in whatever form and by whatever means they

may have been created or stored, including any form of computer or electronic

storage (such as hard disks or other media that can store data); any handmade form

(such as writing, drawing, painting); any mechanical form (such as printing or

typing); and any photographic form (such as microfilm, microfiche, prints, slides,

negatives, videotapes, motion pictures, photocopies).

23. The items described above may be searched and seized irrespective of whether

they are stored or maintained in electronic, magnetic, optical, digital, or paper

format. This warrant specifically authorizes the search and seizure of records

maintained on computer storage media, including computer hard drives, diskettes,

Compact Discs (CD), Digital Video Discs (DVD), USB storage device (e.g.,

thumb drives, external hard drives), or any other media capable of storing

information in a form readable by a computer. This also includes all copies of the

information described above that may be located on any handheld computers or

other portable computing or data storage device, and any stored information that is

maintained as archive or backup copies.

24. In order to obtain the above described records, the agents are authorized to seize

the computers and/or storage media and make a mirror image of the computers

and/or storage media off-site for the purposes of searching. Upon completion of

10

the off-site imaging, the agents will attempt to return the seized computers and/or storage media. In addition, if the information described above cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and instruct on its installation and use.