# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **Case No. 3:17-CR-155-L** |
| | § | |
| **JAMSHID NORYIAN (01)** | § | |
| **DEHSHID NOURIAN (02)** | § | |
| **CHRISTOPHER RYDBERG (03)** | § | |
| | § | |

## DEFENDANT CHRISTOPHER RYDBERG'S
## MOTION FOR ACQUITTAL UNDER RULE 29

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

MEMORANDUM OF LAW AND AUTHORITIES ........................................................1

BACKGROUND...............................................................................................................2

A.  Rydberg worked for the real estate office performing clerical or administrative tasks at the direction of others and without any knowledge of the larger purpose of those tasks. ..................2

B.  Rydberg was involved in Noryian's real estate business, not the pharmacy, and any pharmacy-related tasks he performed were ministerial and did not involve the alleged fraudulent billing or kickback scheme. .................................................................................................................3

C.  Dr. Williams conceded his memories of discussing kickbacks with Rydberg were inaccurate, and there was no other evidence presented that Rydberg had knowledge or intent to participate in a kickback scheme....................................................................................................................7

D.  Although Rydberg was a signatory on accounts involved in Challenged Transactions, there was no evidence that Rydberg knew the purpose of those transactions or that they involved the proceeds of illegal activity. .........................................................................................................10

E.  Rydberg had no role in preparing the relevant tax returns, other than the clerical task of providing requested documents to the tax preparers..................................................................13

F.  Rydberg received no financial benefit from any purported healthcare fraud or other scheme...14

LEGAL STANDARD.....................................................................................................14

ARGUMENT ..................................................................................................................15

A.   The Government has not met its burden of proof for the money laundering charges...............15

a.  The Government failed to present evidence that Rydberg knew that the funds involved in the Challenged Transaction were the proceeds of illegal activity....................................................16

b.  The Government failed to present any evidence of concealment. ..........................................17

c.  The Government failed to present evidence that the Challenged Transactions were designed to disguise the nature of the funds.............................................................................................18

B.  The Government has not met its burden of proof for the conspiracy to launder money charges.........................................................................................................................................19

C.  The Government has not met its burden of proof for the conspiracy to commit healthcare fraud charge. .......................................................................................................................................21

D.  The Government has not met its burden of proof for the conspiracy to defraud the United States
    charge. ..................................................................................................................................24

CONCLUSION ..........................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Regalado Cuellar v. United States*,
   553 U.S. 550 (2008) .................................................................................................18

*United States v. Burns*,
   162 F.3d 840 (5th Cir. 1998) ....................................................................................17

*United States v. Campos*,
   20 F.3d 1171, 1994 WL 144866 (5th Cir. Apr. 14, 1994) ........................................15

*United States v. Cessa*,
   785 F.3d 165 (5th Cir. 2015) ....................................................................................20

*United States v. DiSimone*,
   660 F.2d 532 (5th Cir. 1981) .................................................................................1, 24

*United States v. Dobbs*,
   63 F.3d 391 (5th Cir. 1995) ......................................................................................18

*United States v. Mackay*,
   33 F.3d 489 (5th Cir. 1994) ......................................................................................23

*United States v. McCall*,
   553 F.3d 821 (5th Cir. 2008) ....................................................................................15

*United States v. Romo*,
   669 F.2d 285 (5th Cir. 1982) ....................................................................................23

*United States v. Sanchez*,
   961 F.2d 1169 (5th Cir.), *cert. denied* 506 U.S. 918 (1992)) ..................................15

*United States v. Valdez*,
   726 F.3d 684 (5th Cir. 2013) ....................................................................................17

*United States v. White*,
   569 F.2d 263 (5th Cir.), *cert. denied* 439 U.S. 848 (1978) .................................1, 23

*United States v. Williams*,
   809 F.2d 1072 (5th Cir. 1987) ..................................................................................24

**Rules**

18 U.S.C. § 1956(a)(1)(B)(i) .........................................................................................15

18 U.S.C. § 1956(h ........................................................................................................19

18 USC § 371 ..................................................................................................................24

18 USC 1349 ..................................................................................................................21

## MEMORANDUM OF LAW AND AUTHORITIES

Throughout this case, and repeatedly in its opening statement, the Government characterized Defendant Christopher Rydberg as the "money guy" in his step-family's business.  *E.g.*, Trial Tr. Vol. 1A 58:9-11. But, as Rydberg's counsel correctly predicted, the evidence showed that Rydberg was the "money guy" only in the sense that a bank teller is a money guy.  Trial Tr. Vol. 1A 107:14-21.  Witness after witness confirmed that Rydberg was functionally a clerical employee in Defendant Jamshid Noryian's real estate business.  Rydberg completed the administrative tasks necessary to write checks and transfer money between accounts—but only as directed and without any knowledge of the purpose of those transactions or their role in a larger alleged scheme.

Because so few of the Government's allegations can be directly linked to Rydberg, the Government hopes instead to lump him in with the other defendants based on his familial relationship with them, as demonstrated by the Government's frequent reference to "Mr. Rydberg and the Noryians" throughout its opening statement.  But Fifth Circuit law is clear: mere association or a family relationship is not enough to prove the elements of conspiracy. *United States v. White*, 569 F.2d 263, 268 (5th Cir.) (citations omitted), *cert. denied* 439 U.S. 848 (1978).   Efforts to place a defendant in "a climate of activity that reeks of something foul," without evidence of knowledge or intent, is insufficient to "prove[] beyond a reasonable doubt that [a defendant] had the 'deliberate, knowing, specific intent to join the conspiracy.'"  *United States v. DiSimone*, 660 F.2d 532, 537 (5th Cir. 1981).  Here, the Government has presented evidence only that Rydberg was related to Noryian and performed some clerical work for him; it has presented no evidence that Rydberg entered any agreement, knew of any agreement, or intended to further any agreement associated with any of the conspiracies charged in this case.  A reasonable jury cannot sustain a conviction against Rydberg on any of the charges against him.

For these and the following reasons, the evidence presented during the Government's case-in-chief is insufficient to sustain a conviction against Rydberg on any element of any of the charges

1

against him.  Under Federal of Criminal Procedure 29, the Court must acquit Rydberg on each of the charges.

## BACKGROUND

**A. Rydberg worked for the real estate office performing clerical or administrative tasks at the direction of others and without any knowledge of the larger purpose of those tasks.**

Rydberg is James Noryian's stepson, and Noryian has been a part of Rydberg's life for a long time.  Trial Tr. Vol. 3B 16:23-17:3 (Necessary).  Rydberg looked up to, trusted, and loved Noryian, and told his co-workers that he felt loyal to his step-father.  Trial Tr. Vol. 3B 17:4-10 (Necessary); Trial Tr. Vol. 4B 47:3-14 (Jossa).  After an uneven education and early career, Rydberg joined his step-father's real estate business, Noryian & Associates.  Rydberg did not appear to be someone with millions of dollars; he did not wear expensive clothes or watches or drive expensive cars.  Trial Tr. Vol. 3B 27:24-29:24 (Necessary).

Kim Necessary worked closely with Rydberg between 2014 and 2016 while she was employed at Noryian & Associates.  Trial Tr. Vol. 3B 10:19-24 (Necessary).  Necessary testified that she and Rydberg performed many of the same types of administrative functions for the real estate business, including managing rent checks, paying utility bills and property taxes, dealing with various maintenance issues, and other routine tasks.  Trial Tr. Vol. 3B 11:20-12:14 (Necessary).  She testified that from her perspective, she and Rydberg were both basically assistants to Noryian.  Trial Tr. Vol. 3B 12:15-21 (Necessary).  Noryian & Associates was not run like a father-son partnership, in which Noryian and Rydberg had an equal role.  Trial Tr. Vol. 3B 17:11-15 (Necessary).  Noryian was clearly in charge of Rydberg, and Rydberg followed Noryian's instructions and did not act independently.  Trial Tr. Vol. 3B 17:22-18:16 (Necessary).  Noryian's former girlfriend, Dr. Marjaneh Hedayat, testified that Rydberg "acted like a secretary" and would handle things like plane tickets and hotel reservations.  Trial Tr. Vol. 10B 45:22-46:3 (Hedayat). Noryian would give his employees, including Rydberg, instructions or directions without explaining himself or getting into

the "whys" of why something was wanted.  Trial Tr. Vol. 3B 18:21-19:6 (Necessary).  Even if Rydberg was nominally "in charge" while Noryian was out of the office, he would still check in with Noryian for any big or small decisions.  Trial Tr. Vol. 3B 61:4-7 (Necessary).

One of Necessary's and Rydberg's tasks was to write checks.  Noryian and his family members had various business interests organized through various entities, and Rydberg was listed as a signatory on several bank accounts so that he could do paperwork.  Trial Tr. Vol. 3B 21:3-8 (Necessary).  Necessary would typically fill out the checks to pay various bills related to the real estate interests, and Rydberg would sign those checks, sometimes dozens of checks per week.  Trial Tr. Vol. 3B 21:12-22:25 (Necessary).  At one point, Necessary, Rydberg, and another Noryian & Associate employee made business cards in which they gave themselves titles at various entities connected with Noryian, such as Director of Operations or Manager for Necessary and CFO for Rydberg.  Trial Tr. Vol. 3B 24:12-20 (Necessary).  These titles did not reflect their actual job titles or responsibilities; rather, Necessary understood that Noryian wanted her and Rydberg to use these titles merely to facilitate paperwork.  Trial Tr. Vol. 3B 24:21-26:12 (Necessary).  Rydberg was merely signing checks at the direction of others; he was not performing the typical CFO duties, such as making budgets or projections or holding shareholder meetings.  *Id.*

Rydberg's relationship with his step-father was often volatile and strained.  Necessary recalled Noryian screaming at Rydberg while she worked at Noryian & Associates.  Trial Tr. Vol. 3B 9:4-6 (Necessary).  Noryian would become angry with Rydberg out of nowhere. Trial Tr. Vol. 3B 19:18-23 (Necessary).  Noryian even fired Rydberg multiple times, though he would ultimately hire Rydberg back once the relationship was repaired.  Trial Tr. Vol. 3B 20:8-19 (Necessary).

**B. Rydberg was involved in Noryian's real estate business, not the pharmacy, and any pharmacy-related tasks he performed were ministerial and did not involve the alleged fraudulent billing or kickback scheme.**

Although the Government charged other Defendants with healthcare fraud, Rydberg was charged only with conspiracy to commit healthcare fraud and not with any of the underlying

healthcare fraud counts.  Trial Tr. Vol. 2B 57:23-25 (Cook).  As each of the pharmacy or Noryian & Associates employees testified, Rydberg had little to no involvement in the running of the pharmacy.   Though the Hemphill office of the real estate business was initially in the same building as Ability Pharmacy, the real estate office later moved to the College location, which was completely separate from the pharmacy business.  Trial Tr. Vol. 3B 10:25-11:6 (Necessary).  When the real estate and pharmacy businesses were located in the same business, they shared a breakroom and pharmacy employees interacted with Rydberg socially.  Trial Tr. Vol. 4B 127:13-20, 161:23-161:24 (Marines).  Once the real estate office moved locations, Necessary and Rydberg spent little time at the pharmacy businesses.  Trial Tr. Vol. 3B 12:22-13:15 (Necessary); Trial Tr. Vol. 4B 151:13-23, 162:23-163:13 (Marines).  The Government presented evidence that some pharmacy materials were retrieved from the real estate office where Rydberg worked, *see* Trial Tr. Vol. 6A 16:12-17, but every witness with knowledge repeatedly confirmed that Rydberg worked for the real estate company and was not involved in reviewing or preparing pharmacy records or prescriptions.

Rydberg sometimes assisted with moving money from one account to another at the pharmacy or writing checks, but those tasks were always at the direction of James Noryian.  Trial Tr. Vol. 3B 16:9-17 (Necessary); *see also* Trial Tr. Vol. 4B 161:23-24 (Marines) ("Q: Who was Chris Rydberg's boss? A: James Noryian.").  The employees of both the real estate and pharmacy businesses understood that Rydberg's business was real estate, not pharmacy.  Trial Tr. Vol. 3B 16:18-22 (Necessary); Trial Tr. Vol. 4A 45:16-21 (Jossa); Trial Tr. Vol. 4B 143:21-25 (Marines). Rydberg had financial responsibility just "[o]f the real estate [business] to [Jossa's] knowledge, that is all [Rydberg] dealt with."  Trial Tr. Vol. 4A 46:4-8 (Jossa).  Pharmacy employees never saw Rydberg interact with doctors or participate in the preparation of any creams, nor did he instruct any pharmacy employees to call patients or doctors.  Trial Tr. Vol. 4B 161:6-22 (Marines).  He never requested daily reports or inquire about profits at the pharmacy.  Trial Tr. Vol. 4B 164:1-11 (Marines).  His interactions with the pharmacists were limited to "just cordial talk, like everybody

4

else." Trial Tr. Vol. 4B 161:11-13 (Marines). Rydberg was not the "boss" of anyone at the pharmacy nor was he involved in the day-to-day operations of any of the pharmacies. Trial Tr. Vol. 4B 163:21-22, 164:7-11 (Marines). Dr. Jiminez, the Government's medical expert, did not recall seeing Rydberg's name in the medical records he reviewed, nor did he form an opinion regarding Rydberg. Trial Tr. Vol. 9B 123:1-12, 124:10-17 (Jiminez).

Pharmacy employee Robbie Jossa spent much of his time around Rydberg. In 2015 while working or Ability Pharmacy, Jossa lived with Noryian and Rydberg and shared an office with Rydberg in the real estate offices that shared the building with Ability Pharmacy. Trial Tr. Vol. 4A 13:12-19, 20:18-23, 24:17-25:1 (Jossa). Yet, Jossa emphatically stated that he had "one hundred percent dealings with" Noryian: "All of our agreements was [sic] with him. I had no agreement with Chris. ***I never discussed business with Chris***." Trial Tr. Vol. 4A 59:10-17 (Jossa).[1]

To the extent Rydberg had any role in the pharmacy business at all, it was limited to the ministerial tasks required to complete payments at the direction of others. Necessary recalled that one time she witnessed Rydberg making some edits to a prescription pad, but that it would have been merely clerical changes done at the direction of Robert Ritter or James Noryian and would not have involved changes to the percentages or ingredients of prescribed medication. Trial Tr. Vol. 3B 13:21-14:11 (Necessary). Rydberg did not submit any claims to insurance companies or deal with the Department of Labor to claim reimbursements for prescriptions. Trial Tr. Vol. 3B 38:21-25 (Necessary). As part of his administrative work, Rydberg issued bonus checks to employees of

---

[1] Jossa recalled Rydberg being present for a conversation related to any unusual activity at the pharmacy was that Rydberg was occasionally present when Noryian would joke about a flood that destroyed documents during an audit years earlier. Trial Tr. Vol. 4A 48:13-49:14 (Jossa). However, Jossa's testimony made clear that the audit occurred at an earlier time when most records were paper; the joke did not relate to any of the conduct, including any purported conspiracy, charged in this case. *Id.* Jossa also recalled Rydberg being present during an argument between Jossa and Noryian regarding Jossa's commissions, but he did not recall what specifically was said nor did he indicate the argument involved an explicit discussion of a kickback scheme as opposed to lawful money owed for work performed. Trial Tr. Vol. 4A 90:21-92:6 (Jossa).

Noryian's businesses, including pharmacy employees.   Trial Tr. Vol. 4B 140:6-21 (Marines). However, the bonuses were paid at the discretion of Noryian, who asked pharmacy employees to write him a letter justifying their bonuses.   Trial Tr. Vol. 4B 140:6-21 (Marines).

The Government presented evidence that Rydberg was listed as the manager and contact person on a payment information form from the Government for "Ability Pharmacy Inc. #1, which provided ACH payment information to the Department of the Treasury so that the pharmacy could be paid electronically.   Trial Tr. Vol. 1B 71:10-72:2 (Cook); Gov't Ex. 201.   As Dr. Cook clarified, the form only provided information about the entities bank account to facilitate payments; it was not the form required for physicians or other prescribers to become approved providers with certain Government agencies.   Trial Tr. Vol. 2B 65:1-66:16. Further, the fact that Rydberg's name and signature were on the document merely meant that he was the contact person and did not indicate that he had an ownership or financial interest in the pharmacy, that he was the pharmacist in charge, or that he was responsible for or billing on behalf of the pharmacy.   Trial Tr. Vol. 2B 66:17-67:10, 68:10-13 (Cook).   Dr. Cook did not know why Rydberg's name was on the form or who directed that Rydberg should be the contact person.   Trial Tr. Vol. 2B 69:1-7.

TD Ameritrade representative Jared Haggard testified regarding phone records that listed a handful of conversations involving Rydberg.   Specifically, TD Ameritrade's phone records indicate that Noryian asked Rydberg to hand him a prescription during a phone call once.   Trial Tr. Vol. 4B 75:23-76:10 (Haggard).   Rydberg also spoke with TD Ameritrade to transfer funds between accounts and to facilitate the completion of due diligence paperwork, which he asked to be sent to Noryian at Noryian's e-mail address.   Trial Tr. Vol. 4B 105:17-21, 106:17-21, 107:6-11, 107:21-25, 108:13-23, 109:5-17 (Haggard).   But Haggard testified that none of these conversations indicated that Rydberg was involved in the pharmacy business or any purported prescription scheme beyond that of a clerical or administrative employee.   In fact, Haggard was clear that while Rydberg did not own the account and his interactions with Rydberg were limited to "basically just help[ing]

6

with some admin issues with getting the form and things like that." Trial Tr. Vol. 4B 113:20-23, 114:1-12 (Haggard). Haggard "wasn't talking to [Rydberg] about where the money came from, or, you know, like all the conversations I had with James Noryian. It was just some quick admin conversations we had." Trial Tr. Vol. 4B 114:1-12 (Haggard).

### C. Dr. Williams conceded his memories of discussing kickbacks with Rydberg were inaccurate, and there was no other evidence presented that Rydberg had knowledge or intent to participate in a kickback scheme.

The only evidence linking Rydberg with any kickback scheme at the pharmacy was that of Dr. Williams; however, Dr. Williams later conceded that his testimony was not accurate. Williams testified regarding 11 payments that he received in exchange for writing prescriptions to be filled by the pharmacies. Several of the checks had Rydberg's name and signature on them. *See* Gov't Ex. 547 at 1197, 1200, 1204, 1208, 1213, 1218, 1225, 1231, 1236, 19, 21; Trial Tr. Vol 7A 7:21-8:22, 11:1-19, 19:3-20, 22:12-23:2, 25:3-21, 26:24-27:15, 28:23-30:7, 31:14-32:25, 34:5-36:10, 39:22-40:7 (Williams). However, Dr. Williams could not recall a single word that Rydberg said to him at the time Dr. Williams received the checks. Trial Tr. Vol. 7A 97:18-98:3 (Williams). Even taking the evidence in the light most favorable to the Government's theory, there was no evidence Rydberg knew what the purpose of the checks was even if he did deliver them to Dr. Williams.

And there are certainly reasons to doubt that Rydberg delivered any of the checks to Dr. Williams at all. Dr. Williams claimed that his only interactions with Rydberg occurred when Rydberg physically delivered checks to Dr. Williams, but Dr. Williams could not recall any specific times (or how many times) that actually happened. Trial Tr. Vol. 7A 19:3-21, 85:1-4, 98:4-8, 99:20-100:11 ("Q: …I want to know how many times did [Rydberg] give you a check? A: At this point it would be a guess."), 100:20-101:4, 102:5-25, 103:14-16 (Williams). Dr. Williams testified that there were text messages documenting each of the meetings with Rydberg when Rydberg physically gave Dr. Williams a kickback check because virtually all of his communications with Rydberg would have been by text message. Trial Tr. Vol. 7A 104:3-19 (Williams); Trial Tr. Vol. 7B 5:14-

6:3 (Williams).  However, the text messages he referenced were sent in March 2016, *after* Dr. Williams had received and deposited each of the 11 checks.  Trial Tr. Vol. 7A 107:4-112:14 (Williams); Trial Tr. Vol. 7B 13:9-15, 16:1-22:13 (last check was deposited on February 4, 2016) (Williams); Gov't Ex. 547.  Dr. Williams ultimately conceded that Rydberg could not have given him the kickback checks during these meetings, and he did not recall the purpose of those meetings.  Trial Tr. Vol. 7B 22:10-23:11 (Williams); Trial Tr. Vol. 13B 84:15-23, 87:20-25 (Williams).  Although Dr. Williams claimed he had met Rydberg at a Starbucks and Dr. Williams's office on prior occasions, the March 2016 text exchange indicated that Rydberg needed directions to both places, contrary to Dr. Williams's claim they had made at those locations many times previously.  Rydberg Ex. 46; Trial Tr. Vol. 13B 98:3-99:17, 100:1-15 (Williams).  Dr. Williams's claims that he met with Rydberg to receive kickback checks could not be true.  Even if they were, there was no evidence that Rydberg knew the purpose of the check or connected it with any illegal conduct.

Other than performing the administrative task of writing or signing the checks, there is no evidence Rydberg had any knowledge of what the checks were for or why Dr. Williams was receiving them.  Dr. Williams testified that his negotiations and agreement regarding the kickbacks were with Noryian, and Rydberg was not present for those negotiations or subsequent meetings regarding the terms of the arrangement.  Trial Tr. Vol. 7A 90:14-92:9, 92:10-93:9, 97:1-10 (Williams). Similarly, the Government presented an email from Rydberg listing dollar amounts that appeared to correspond with the amounts paid to Dr. Williams, but the email gave no indication that Rydberg knew the purpose of those payments, let alone that the purpose was unlawful kickbacks, or that the entity Magnum Surgical, which received payments, was associated with Dr. Williams.  Trial Tr. Vol. 11B 32:7-33:14 (Ertle); Gov't Ex. 710; Trial Tr. Vol. 13B 102:2-15 (Williams).  The Government also presented evidence of a promissory note with the lender HJLM Holding, LLC and suggested that Rydberg's name was associated with that entity; however, Rydberg's name was not on the note itself, Rydberg had no involvement in conceiving of or drafting the note, Rydberg never

discussed the note with Dr. Williams, and Rydberg was not present when Dr. Williams executed it. Trial Tr. Vol. 7A 73:6-22, 94:17-21, 95:23-96:14 (Williams).

Besides Dr. Williams's testimony, there was no evidence that Rydberg interacted with any of the doctors involved in the purported healthcare fraud scheme. Although Necessary testified that she had visited Dr. Taba on occasion, Rydberg never accompanied her there, nor did she have any knowledge that Rydberg contacted any of Dr. Taba's patients or ever used Dr. Taba's signature stamp to write a prescription. Trial Tr. Vol. 3B 15:24-16:8 (Necessary).

Dr. Aguilar, who wrote prescriptions for Christopher Rydberg and his ex-wife Celine Rydberg, which were paid for by Blue Cross Blue Shield, testified that he wrote those prescriptions at David Nourian's direction for multiple employees at the pharmacy who Dr. Aguilar never examined, including Rydberg and his ex-wife. Trial Tr. Vol. 5A 65:10-66:17, 68:2-69:4 (Aguilar); Trial Tr. Vol. 5A 26:10-27:24 (Chow). Dr. Aguilar was very clear, however, that these prescriptions were not written at Rydberg's direction or with his involvement. Dr. Aguilar testified that *he did not even know Rydberg* and never had any agreement with him to write prescriptions for him or his ex-wife, nor was he told that Rydberg had consented to having his information submitted to an insurance company. Trial Tr. Vol. 5B 51:25-52:10, 52:22-53:8 (Aguilar). In fact, Dr. Aguilar did not even spell Rydberg's name correctly on at least one of the prescriptions. Gov't Ex. 306 at 19.

Finally, Dr. Benson's employee, Latosha Morgan, testified that her interactions with Rydberg were limited to real estate business, for things like rent and maintenance for the office, and that she had no interactions at all with Rydberg with respect to the pharmacy. Trial Tr. Vol. 5B 176:17-177:9 (Morgan). When asked whether Rydberg had anything to do with kickbacks and bribes, Morgan testified clearly, "*To my knowledge, absolutely not.*" Trial Tr. Vol. 5B 177:7-9 (Morgan).

**D.  Although Rydberg was a signatory on accounts involved in Challenged Transactions, there was no evidence that Rydberg knew the purpose of those transactions or that they involved the proceeds of illegal activity.**

The Government charged Rydberg with six counts of money laundering related to money transferred among these accounts:

- **Count 11**, which involved the transfer of $3.5 million from Industrial & Family Pharmacy's Wells Fargo Account #0302 to Industrial & Family Pharmacy's Chase Account #9863;

- **Count 12**, which involved the transfer of $3.5 million from Industrial & Family Pharmacy's Chase Account #9863 to Jade and Joy Holdings's Chase Account #3462;

- **Count 13**, which involved the transfer of $3.5 million from Jade and Joy Holdings's Chase Account #3462 to a Scottrade investment account held by Sherri Mofid;

- **Count 14**, which involved the transfer of $5.266 million from Ability Pharmacy's Prosperity Bank Account #9542 to Ability Pharmacy's Chase Account #2280;

- **Count 15**, which involved the transfer of $5.266 million from Ability Pharmacy's Chase Account #2280 to Jade and Joy Holdings's Chase Account #3462; and

- **Count 16**, which involved the transfer of $5.266 million from Jade and Joy Holdings's Chase Account #3462 to a Wells Fargo bank account held by Deshid Nourian.

ECF No. 162 at 19-20 (together, the "Challenged Transactions").  The Government presented two demonstratives to illustrate the movement of money in the Challenged Transactions:





Burrell testified that Rydberg was one of the signatories on several accounts involved in the

Challenged Transactions.  Trial Tr. Vol. 14A 42:17-46:11 (Burrell); Gov't Exs. 534 (Wells Fargo

Account #8897 for Bandoola Pharmaceutical), 552 (Wells Fargo Account #3119 for HJLM

Holdings), 557 (Wells Fargo Account #0302 for Industrial & Family Pharmacy), 561 (Chase

Account #9863 for Industrial & Family Pharmacy), 564 (Chase Account #3462 for Jade and Joy Holdings), 572 (Prosperity Bank Account #9542 for Ability Pharmacy), 577 (Chase Account #2280 for Ability Pharmacy), 600 (BancorpSouth Bank Account #5371 for Bandoola Pharmaceutical), 609 (Compass Bank Account #4076 for Park Row Pharmacy).  Rydberg was not any owner on any of the accounts, however.  The Government identified only one account owned by Rydberg, and that account was not involved in any of the Challenged Transactions.  Trial Tr. Vol. 20B 78:11-23 (Burrell).

Burrell testified that approximately $82.5 million in funds from the Department of Labor were deposited into the Ability Pharmacy, Park Row Pharmacy, and Industrial & Family Pharmacy accounts.  Trial Tr. Vol. 14B 57:4-59:5 (Burrell); *see also* JX1009 (admitted for demonstrative purposes only and summarizing the DOL deposits).  Burrell conceded that nothing he reviewed confirmed whether any of this amount represented the proceeds of fraud.  Trial Tr. 20B 81:4-19 (Burrell).  Further, Burrell testified that ***he did not actually know who conducted any of the online or wire transfers between the accounts that make up Counts 11 to 16***, even though the six money laundering counts are based only on the online and wire transfers.  Trial Tr. 20B 84:18-22, 85:23-25 (Burrell).

Although Burrell testified the evidence indicated Rydberg took out and signed the cashier's checks involved in the transaction, and illustrated on the above charts, Burrell conceded that none of the substantive counts of money laundering in the superseding indictment—Counts 11 to 16— are based on the withdrawal or re-depositing of the cashier's checks.  Trial Tr. 20B 85:6-22 (Burrell).  Burrell further testified that the cashier's checks were simply withdrawn and then re-deposited into the same account; they did not transfer any money to a different account than the one from which the money originated.  Trial Tr. 20B 93:6-13 (Burrell).  There was a "very clear record" of the movement of the cashier's checks; the withdrawal of the cashier's checks and the endorsement on the back when they were redeposited were done in Rydberg's name and were

12

readily available in the bank records.  Trial Tr. 20B 93:11-18, 94:5-16 (Burrell).  There was no evidence Rydberg did anything to hide his involvement or conceal the transactions.

Burrell conceded that he lacked any personal knowledge about, and thus could not testify to, what any of the defendants, including Rydberg, knew, intended, or agreed to when they undertook the transactions or what the purpose of any of the transactions were.  Trial Tr. Vol. 20B 77:12-78:5 (Burrell). In his review of the evidence, Burrell saw no emails, text messages, recording, or witness testimony that indicated one way or another what the purpose of the Challenged Transactions was.  Trial Tr. Vol 20B 86:5-19 (Burrell).  Burrell further confirmed that he saw no evidence of Rydberg taking money from the accounts and using them for his personal benefit.  Trial Tr. Vol. 20B 80:19-23, 81:20-24 (Burrell).

### E. Rydberg had no role in preparing the relevant tax returns, other than the clerical task of providing requested documents to the tax preparers.

The Government presented no evidence at trial that Rydberg had any knowledge of a tax evasion scheme or provided instructions or substantive assistance to the tax preparers, other than to retrieve documents at their request.  Jamie Allen, who prepared the books that identified business expenses, testified that Noryian provided her with the bank statements for the pharmacy and provided her with the instructions for identifying business expenses.  Trial Tr. Vol. 8 73:10-17, 75:16-22, 106:4-13, 108:9-12 (Allen). Allen testified that she spoke with Rydberg only once when Noryian was not available, but she could not recall the subject of that conversation.  Trial Tr. Vol. 8 77:13-20, 106:14-23 (Allen).  There was no testimony that Rydberg provided her any instructions as to how to categorize expenses, nor did he review or sign off on her work once it was complete.

Likewise, Mohammed Imtiyazuddin, an accountant who helped to prepare tax returns for the pharmacies, testified that Rydberg was his point of contact for retrieving documents from the companies.   Trial  Tr.  Vol.  11B  46:11-47:4,  52:7-25,  55:19-22,  56:9-13,  71:3-5,  72:18-24 (Imtiyazuddin). But Rydberg never gave Imtiyazuddin any instructions or guidance about how to

characterize expenses.   Trial Tr. Vol. 11B 104:19-23 (Imtiyazuddin).   While Rydberg would provide some documents or answers to ministerial questions, Imtiyazuddin understood that the "final answers are from Mr. Nourian," not Rydberg.   Trial Tr. Vol. 11B 60:17-22, 93:15-94:15 (Imtiyazuddin); *see also* Trial Tr. Vol. 10B 45:22-46:3 (Hedayat); Trial Tr. Vol. 11A 13:25-15:18, 18:3-19:2, 41:1-11 (Hedayat) (testifying that Rydberg passed on tax documents from the accountants at the instruction of others); Noryian Ex. 340. Imtiyazuddin understood that Rydberg did not own any of the entities for which he was preparing taxes and testified that he was effectively a delivery person and "not a decision maker."   Trial Tr. Vol. 11B 98:6-99:11 (Imtiyazuddin). Rydberg never reviewed, approved, or signed any of the tax returns on behalf of the pharmacies, nor was Rydberg authorized to finalize the tax returns.   Trial Tr. Vol. 11B 101:10-102:18 (Imtiyazuddin).   Imtiyazuddin viewed Rydberg's role as solely clerical and administrative.   Trial Tr. Vol. 11B 102:19-21 (Imtiyazuddin).

### F.  Rydberg received no financial benefit from any purported healthcare fraud or other scheme.

Although the Government's theory of the case was that Rydberg participated in the healthcare fraud conspiracy to unjustly enrich himself, there was no evidence presented at trial that showed that Rydberg had received *any* of the money from the alleged scheme.   Dr. Cook, one of the Government's Rule 702 witnesses, testified that there was no evidence that showed Rydberg received any of the $90 million paid to the three pharmacies.   Trial Tr. Vol. 2B 69:8-18 (Cook). Imtiyazuddin, who also prepared Rydberg's personal tax return, testified that Rydberg had $24,349 in taxable income in 2015, a year in which the pharmacies reported making millions of dollars. Trial Tr. Vol. 11B 105:21-108 (Imtiyazuddin).

## LEGAL STANDARD

"After the government closes its evidence or after the close of all evidence, the court on the defendant's motion *must* enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (emphasis added). The Court must acquit "[i]f the 'evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." *United States v. Campos*, 20 F.3d 1171, 1994 WL 144866, at *4 (5th Cir. Apr. 14, 1994) (quoting *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir.), *cert. denied* 506 U.S. 918 (1992)). "Rule 29 motions need not be specific." *United States v. McCall*, 553 F.3d 821, 830 (5th Cir. 2008). "[G]eneral language about the insufficiency of all of the evidence for all elements of all counts" in the introduction and conclusion is sufficient to preserve the issue as to all counts. *Id.*

## ARGUMENT

**A.  The Government has not met its burden of proof for the money laundering charges.**

To obtain a conviction for money laundering, the Government must prove beyond a reasonable doubt that (1) the defendant knowingly conducted a financial transaction; (2) the financial transaction involved the proceeds of a specified unlawful activity (here, healthcare fraud); (3) the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i).[2]
The Government failed to meet its burden at trial to establish any of the elements of its money laundering charges, including that Rydberg's actions were intended or designed to conceal or disguise either the Challenged Transactions or the nature of those funds. The Government's evidence against Rydberg consisted of several transactions in which Rydberg took out cashier's

---

[2] The Government has charged Rydberg with concealment money laundering. Although it is also a crime to launder money with the specific intent to promote the carrying on of the healthcare fraud, 18 U.S.C. § 1956(a)(1)(A), the Government did not present evidence linking the money transactions at issue in its money laundering charges with any actions undertaken to promote the healthcare fraud, such as the kickbacks allegedly paid to physicians.

checks from pharmacy bank accounts and then redeposited those checks into the same account. However, this evidence alone is insufficient to satisfy the Government's burden on its money laundering charges.  As an initial matter, *none* of the six counts of money laundering arose from the transactions involving the cashier's checks.   As the Government's chief witness on the money laundering accounts testified, ***there is no evidence who made the online and wire transfers that form the basis for Counts 11 to 16***.  Trial Tr. 20B 84:18-22, 85:23-25 (Burrell). With respect to Rydberg's conduct, and relevant also to the conspiracy to commit healthcare fraud charge, the Government failed to present any evidence that Rydberg knew the funds were the proceeds of unlawful activity.  Additionally, as the Government itself established, the Challenged Transactions were open and notorious.  They were undertaken in Rydberg's name and were readily traceable. Nor was there any attempt to disguise the fact that the funds originated from the pharmacy business. Because the evidence does not establish beyond a reasonable doubt each element of the money laundering charges against Rydberg, the Court must acquit Rydberg on each of the money laundering charges.

> **a.   The Government failed to present evidence that Rydberg knew that the funds involved in the Challenged Transaction were the proceeds of illegal activity.**

First, the Government presented no evidence that Rydberg knew that the funds involved in the Challenged Transactions were the proceeds of healthcare fraud.  The Government's theory is that the defendants engaged in a fraudulent scheme to bill health insurers for unnecessary prescriptions and paid doctors kickbacks to incentivize them to write more prescriptions.  The funds that were allegedly laundered came from the health insurers reimbursing the pharmacy for, as the Government claims, unnecessary prescriptions.

The Government's evidence proved that Rydberg was not in a position to evaluate whether prescriptions were prescribed appropriately by the various physicians involved or not.  Each of the real estate and pharmacy employees testified that Rydberg worked in the real estate business and

had little involvement with the pharmacy.  Trial Tr. Vol. 3B 16:18-22 (Necessary); Trial Tr. Vol. 4A 45:16-21 (Jossa); Trial Tr. Vol. 4B 143:21-25 (Marines).  He was not at all involved in speaking with doctors or patients or writing prescriptions.  Trial Tr. Vol. 4B 161:6-22, 164:1-11 (Marines). Dr. Jiminez, the Government's Rule 702 witness regarding the appropriateness of the medications prescribed, did not recall seeing Rydberg's name in any of the medical records, nor did he form an opinion regarding Rydberg's activity.   Trial Tr. Vol. 9B 123:1-12, 124:10-17 (Jiminez). Accordingly, the Government offered no evidence linking Rydberg to wrongful charges to the health insurers or that Rydberg knew the healthcare companies were being fraudulently billed. Thus, there is no evidence that Rydberg knew the proceeds were illegal as required to sustain a money laundering charge.

### b.  The Government failed to present any evidence of concealment.

Next, the Government's chief evidence against Rydberg is that his name and/or signature were on the checks and account documents involved in the alleged money laundering scheme.  Trial Tr. 20B 93:11-18, 94:5-16 (Burrell).  According to the Government, Rydberg's scheme involved using cashier's checks with his name on it to transfer funds between accounts on which he was a signatory, though not an owner.

The Fifth Circuit has repeatedly held that one cannot be convicted of *concealment* money laundering without some evidence of an attempt at concealment.  In determining whether the Government has met its burden, the Fifth Circuit looks to the "usual hallmarks of an intent to conceal" like use of "false names, third parties, or any particularly complicated financial maneuvers."  *United States v. Valdez*, 726 F.3d 684, 690 (5th Cir. 2013) (citing *United States v. Burns*, 162 F.3d 840, 848-49 (5th Cir. 1998)).  In *Valdez*, the Fifth Circuit reversed a defendant's conviction for concealment money laundering because the only proof the Government offered was "Valdez's transfer of funds from his operating accounts to investment accounts…all done openly,

in his name." 726 F.3d at 690.[3]  As a result, "[t]here [was] virtually no evidence of a design to conceal" the transactions. *Id.*  Further, the fact that a defendant used cashier's checks or engaged in unusual financial transactions is not, without more, evidence of concealment.  For example, in *Dobbs*, the Fifth Circuit reversed a conviction for money laundering where the defendant, among other transactions, "converted a cattle sale check for approximately $37,000 into a cashiers check for $37,000 and then converted the cashiers check into four separate cashier's checks," which he used to pay expenses. *United States v. Dobbs*, 63 F.3d 391, 397 (5th Cir. 1995).  The court rejected the Government's position that the use of cashier's checks was evidence of concealment, finding instead that the "transactions were open and notorious—at least as much as the typical bank transactions can be" because the defendant "did not use any third parties to make purchases or otherwise hide his identity when making the transactions." *Id.*

As in *Valdez* and *Dobbs*, the Government's only basis for charging Rydberg for money laundering is that the cashier's checks were withdrawn and redeposited under his name in accounts on which he was a signatory.  There is no evidence Rydberg made any attempt to conceal the transactions or his involvement in them.  None of the "usual hallmarks" of concealment is present in this case.  The evidence of money laundering is insufficient to sustain a conviction.

### c.  The Government failed to present evidence that the Challenged Transactions were designed to disguise the nature of the funds.

Finally, the Government has shown no evidence that these maneuvers were intended to "legitimize" illegitimate wealth.  It is not enough that a party moves or transfers money; the Government must "show a desire to create the appearance of legitimate wealth or otherwise conceal the nature of funds so that it might enter the economy as legitimate funds." *Dobbs*, 63 F.3d at 397; *see also Regalado Cuellar v. United States*, 553 U.S. 550, 566 (2008) ("[H]ow one moves

---

[3] The Court sustained Valdez's conviction for promotion money laundering based on conduct that is not at issue here. *Id.* at 690-91.

the money is distinct from why one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter."). Even where the Court finds evidence that a fraud occurred, there must be a "link between th[e] evidence of fraud and the[] specific transactions" at issue or a showing that "the transactions were done to disguise the relationship between [the defendant] and the proceeds." *Dobbs*, 63 F.3d at 398. "[M]erely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime." *Id.*

The Government has presented no evidence supporting its speculation that these transactions were undertaken to disguise the nature of the funds. As the record shows, each of the healthcare companies kept track of how much they paid the pharmacies, and those payments were issued electronically. The funds that were moved to other accounts were done so using a cashier's check, not cash, and were paid into other accounts owned by Noryian, Nourian, or other related parties or businesses. Each of these transactions generated records. As the transactions were kept among the Defendants or related persons or entities, the Government has offered no evidence that the transactions were done to disguise the relationship between the defendants and the funds being transferred. *Dobbs*, 63 F.3d at 398.

**B. The Government has not met its burden of proof for the conspiracy to launder money charges.**

To obtain a conviction for conspiracy to launder money and engage in monetary transactions in criminally derived property, the Government must show proof beyond a reasonable doubt that there was an agreement between two or more persons to commit money laundering and that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose. *See* 18 U.S.C. § 1956(h).

Once again, the Government failed to present evidence to support any of these elements with respect to Rydberg. As discussed, the Government failed to present evidence to support the underlying money laundering charges against Rydberg, and the conspiracy charges fail for the same

reasons.  *See supra* Argument § A.  The Government's conspiracy to launder money charges also fail because the Government presented no evidence of any agreement and failed to present any evidence that Rydberg joined that agreement knowing its purpose and with the intent to further that purpose.  Accordingly, Rydberg must be acquitted of this charge as well.

The only evidence of money laundering that the Government presented that linked Rydberg to that activity was evidence that Rydberg took out cashier's checks in his name and redeposited or exchanged them.  Trial Tr. 20B 93:11-18, 94:5-16 (Burrell).  However, it presented no evidence that Rydberg entered into any agreement with anyone else to launder money or that he understood the effect of these transactions would be to launder money.   In fact, as discussed previously, the Government presented no evidence that Rydberg undertook the Challenged Transactions with the knowledge that the funds were the proceeds of illegal activity or with a design to conceal or disguise the nature of the funds.  *See supra* Argument § A.

Without any direct evidence, the Government instead hopes to prove a conspiracy through insinuation and innuendo.  The Government expects the jury to infer knowledge and intent from the mere fact that the transactions occurred. Specifically, the Government has focused on the fact that the Challenged Transactions used unusual or suspicious means, like redepositing or exchanging cashier's checks, to move the funds.  But evidence that aspects of a transaction are suspicious or odd is not sufficient to meet the Government's burden to establish the specific intent to launder money or participate in a conspiracy to launder money.  *United States v. Cessa*, 785 F.3d 165, 179 (5th Cir. 2015) (holding that evidence that a horse trainer received large payments from known drug dealers for horse training services, without more, was insufficient to convict the horse trainer of money laundering).  "[T]here must be 'some *additional evidence* beyond the bare transaction…itself to infer specific intent' to join a conspiracy to commit financial-transaction money laundering."  *Id.* (quoting *Trejo*, 610 F.3d at 315).  For the Government to prove its conspiracy charge against Rydberg, "[t]here must be some additional circumstantial evidence of intent to further the illegal conspiracy" besides

the fact that the transactions occurred. *Id.* The Government failed to present any circumstantial evidence to support its case. The record is devoid of any evidence demonstrating that Rydberg had knowledge or understanding about the inner workings of a healthcare fraud conspiracy, that he knew the money he was transferring was the proceeds of illegal activity, or that his transactions would have the effect of laundering money. Without any evidence of knowledge or intent to participate in a money laundering conspiracy, the Government cannot sustain its burden of proof, and the Court just acquit Rydberg on the conspiracy to launder money charge.

### C. The Government has not met its burden of proof for the conspiracy to commit healthcare fraud charge.

To obtain a conviction for conspiracy to commit healthcare fraud, the Government must show proof beyond a reasonable doubt that there was an agreement between two or more persons to commit healthcare fraud and that the defendant voluntarily joined the agreement knowing its purpose and with the intent to further the illegal purpose. *See* 18 USC 1349. Rydberg was charged only with conspiracy to commit healthcare fraud and not with any of the underlying healthcare fraud counts. Trial Tr. Vol. 2B 57:23-25 (Cook). The Government failed to meet its burden as to any of these elements. Although the Government presented evidence that Rydberg wrote checks that may have been used to pay doctors kickbacks, the Government presented no evidence that Rydberg entered into or knew of any agreement to commit healthcare fraud, nor was there any evidence that Rydberg intended to further the purpose of any such agreement or knew what the checks were for. Accordingly, the Government must acquit Rydberg of conspiracy to commit healthcare fraud.

First, there was no evidence that Rydberg entered into—or even knew of—any agreement to commit healthcare fraud. Each witness with knowledge of the pharmacy business testified that Rydberg worked for his step-father's real estate business and had little involvement with the pharmacy business. Trial Tr. Vol. 3B 16:18-22 (Necessary); Trial Tr. Vol. 4A 45:16-21, 46:4-8 (testifying that Rydberg had financial responsibility just "[o]f the real estate [business] to [Jossa's]

knowledge, that is all [Rydberg] dealt with") (Jossa); Trial Tr. Vol. 4B 143:21-25 (Marines).  As discussed in the prior section, there was no evidence Rydberg had the knowledge or experience necessary to determine whether prescriptions were being appropriately prescribed and billed.  Trial Tr. Vol. 4B 161:6-22, 164:1-11 (Marines); Trial Tr. Vol. 3B 38:21-25 (Necessary).  In fact, the Government's expert witness who testified about the appropriateness of various prescriptions did not recall seeing Rydberg's name in any of the medical records he reviewed, and he offered no opinions regarding Rydberg.  Trial Tr. Vol. 9B 123:1-12, 124:10-17 (Jiminez).  To the extent Rydberg managed funds coming in or out of the pharmacy, it was limited to the type of admin or clerical work that he did for the real estate businesses.  Trial Tr. Vol. 4B 113:20-23, 114:1-12 (Haggard) (testifying that his interactions with Rydberg were limited to "some quick admin conversations we had").

Likewise, there was no evidence Rydberg knew of any agreement to pay improper kickbacks to physicians in exchange for prescriptions.  Except for Dr. Williams, none of the other parties engaged in the alleged kickback scheme had any interaction with Rydberg related to writing prescriptions or receiving payments.  Trial Tr. Vol. 4A 59:10-17 (Jossa) ("I never discussed business with Chris."); Trial Tr. Vol. 3B 15:24-16:8 (Necessary) (Rydberg never accompanied Necessary to meet with Dr. Taba); Trial Tr. Vol. 5B 51:25-52:10, 52:22-53:8 (Aguilar) (Dr. Aguilar did not know Rydberg); Trial Tr. Vol. 5B 177:7-9 (Morgan) (When asked whether Rydberg had anything to do with kickbacks and bribes, Dr. Benson's employee Latosha Morgan testified clearly, "***To my knowledge, absolutely not***.").

The only evidence linking Rydberg to any kickback scheme was the testimony of Dr. Williams, who claimed that Rydberg delivered some of the kickback checks to Dr. Williams. But Dr. Williams testimony later unraveled, and he admitted that the events could not have happened the way he claimed. Trial Tr. Vol. 7B 22:10-23:11 (Williams); Trial Tr. Vol. 13B 84:15-23, 87:20-25 (Williams).  However, even crediting Dr. Williams's testimony, Dr. Williams consistently testified that his agreement to receive kickbacks was with Noryian, not Rydberg, and that he never discussed

22

the terms of the arrangement with Rydberg, nor could Dr. Williams recall any conversations with Rydberg in which Rydberg acknowledge the purpose of the checks. Trial Tr. Vol. 7A 90:14-92:9, 92:10-93:9, 97:1-10, 97:18-98:3 (Williams). Thus, there is no evidence Rydberg knew of the existence of an agreement to pay kickbacks to the doctors in exchange for prescriptions.

Second, there was no evidence that Rydberg intended to further the purpose of any agreement to commit healthcare fraud. The extent of Rydberg's involvement in any healthcare scheme was writing and signing a few checks, consistent with the type of clerical and administrative work he performed for Noryian's businesses. Even crediting Dr. Williams's testimony that Rydberg delivered checks to him, the Government presented no evidence Rydberg knew what the checks were for, that he knew they were improper or illegal, or that he was in any way enriched by virtue of the purported healthcare scheme. The fact that Rydberg may have signed or even transported checks written at the request of others does not support the interference that Rydberg *knew* the checks were part of an illegal kickback scheme and intended to further it. *See United States v. Mackay*, 33 F.3d 489, 494 (5th Cir. 1994) ("[E]vidence that the companion helped transport the backhoe does not prove that he agreed…to transport a *stolen* backhoe.").

Rather, the Government seeks to rely on evidence that Rydberg associated with those involved in a conspiracy or was in the vicinity of the conspiracy to meet its burden to prove Rydberg's intent. But the Fifth Circuit has a "long-established rule that a defendant's guilt may not be proven by showing that he associates with unsavory characters." *United States v. Romo*, 669 F.2d 285, 288 (5th Cir. 1982). "[I]t is well-settled that a conspiracy cannot be proven solen by family relationship or other types of close association. Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other do not establish the existence of a conspiracy." *United States v. White*, 569 F.2d 263, 268 (5th Cir.) (citations omitted), *cert. denied* 439 U.S. 848 (1978). Evidence that merely establishes that a defendant was in "a climate of activity that reeks of something foul" is insufficient to "prove[] beyond a reasonable doubt that [a defendant]

had the 'deliberate, knowing, specific intent to join the conspiracy.'" *United States v. DiSimone*, 660 F.2d 532, 537 (5th Cir. 1981).  A reasonable jury could not sustain a conviction on this evidence.

### D.  The Government has not met its burden of proof for the conspiracy to defraud the United States charge.

Finally, to obtain a conviction for conspiracy to defraud the United States, the Government must show proof beyond a reasonable doubt that there was an agreement between two or more persons to commit tax fraud and that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.  18 USC § 371.  To meet its burden, the Government must prove that the defendant knowingly acted with the expectation that his actions would be used to file a false tax return.  *United States v. Williams*, 809 F.2d 1072, 1095 (5th Cir. 1987).  The Government presented no evidence to support any of the elements, and thus Rydberg must be acquitted on this charge as well.

The Government failed to present any evidence to support its claim that Rydberg entered an agreement to commit tax fraud or that he engaged in transactions with the expectation or intent that his actions would contribute to the filing of a false tax return. Each witness involved in preparing taxes testified that Rydberg provided documents at their request but was not involved beyond a clerical or administrative role.  Trial Tr. Vol. 11B 46:11-47:4, 52:7-25, 55:19-22, 56:9-13, 71:3-5, 72:18-24, 102:19-21 (Imtiyazuddin); Trial Tr. Vol. 11A 13:25-15:18, 18:3-19:2, 41:1-11 (Hedayat). He did not instruct them on how to characterize expenses, nor was there evidence he reviewed the final tax returns, signed them, or approved them for filing.  Trial Tr. Vol. 8 73:10-17, 75:16-22, 106:4-13, 108:9-12 (Allen); Trial Tr. Vol. 11B 101:10-102:18, 104:19-23 (Imtiyazuddin). To the extent Rydberg took out cashier's checks that were later characterized on others' tax returns as business expenses, there is no evidence that he knew how those expenses would be characterized or that the cashier's checks were part of any tax scheme.  Further, there is no evidence Rydberg benefited from any alleged tax fraud.  Trial Tr. Vol. 11B 105:21-108 (Imtiyazuddin).  In fact, the

Government's witness, Agent Little, confirmed he had no evidence that there was any benefit to Rydberg. Although Rydberg may have been a signatory or agent for some of the business involved, he was not an owner and was not entitled to any benefit claimed by those entities on their taxes. Trial Tr. Vol. 11B 105:21-108 (Imtiyazuddin).

At most, the Government cites evidence that Rydberg withdrew money for cashier's checks and then later re-deposited them. But the Government presents no evidence linking Rydberg's actions with any knowledge about the tax treatment of the cashier's checks. Although the Government can rely on circumstantial evidence, it "must do more than pile inference upon inference upon which to base a conspiracy charge." *Mackay*, 33 F.3d at 494. Without direct evidence of Rydberg's knowledge or intent, the Government's position would require multiple inferences to link Rydberg to tax fraud. Based solely on the evidence that Rydberg took out cashier's checks and re-deposited them, the jury would have to infer that Rydberg took out the cashier's check knowing at the time that they would not be used for the listed purpose. Then, the jury would have to infer that Rydberg knew those checks would be later characterized on various tax returns as "business expenses." And the jury would have to infer that Rydberg would know that characterization was improper and would provide a tax benefit. The evidence is simply insufficient to make these leaps. In *Williams*, the Fifth Circuit reversed a conviction for conspiracy to submit false tax returns where the only evidence against one of the conspirators was that he made a "cash check swap." 809 F.2d at 1094-95. The Court held that the evidence of the transaction did not support the inference that the defendant "knowingly made the exchange *with the expectation* that [another conspirator] would use it to file a false tax return." *Id.* at 1095. "A reasonable minded jury would necessarily entertain a reasonable doubt of [the defendant's] guilt upon these facts." *Id*. Here too, the record does not support the inference that Rydberg knowingly undertook transactions with the expectation that others would submit false tax returns months later. The evidence is insufficient for a reasonable jury to find Rydberg guilty on these facts.

## CONCLUSION

For the foregoing reasons, the Government's case against Rydberg falls woefully short of its burden.  The evidence is wholly insufficient for any jury to convict.  The Court must therefore acquit Rydberg of all the charges against him under Rule 29.

Respectfully submitted,

/s/ *Margaret Terwey*
Andrew O. Wirmani
Texas Bar No. 24052287
andrew.wirmani@rm-firm.com
Joshua M. Russ
Texas Bar No. 24074990
josh.russ@rm-firm.com
Margaret D. Terwey
Texas Bar No. 24087454
margaret.terwey@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St.,
Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

ATTORNEYS FOR CHRISTOPHER RYDBERG

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument was served by electronic transmittal by CM/ECF to opposing counsel on November 6, 2023.

<u>/s/ *Margaret Terwey*</u>
Margaret Terwey